CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
DEC 05 2011
JULIA C. DUDLEY, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| ADELSON MICHEL, | ) | CASE NO. 5:06CR00041 |
| | ) | (CASE NO. 5:10CV80281) |
| Petitioner, | ) | |
| | ) | REPORT AND RECOMENDATION |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | By: B. WAUGH CRIGLER |
| Respondent. | ) | U.S. MAGISTRATE JUDGE |

On August 23, 2010, Adelson Michel ("petitioner") filed a petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 ("petition"). The United States moved to dismiss, and on February 25, 2011, the case was referred to the undersigned under the authority of 28 U.S.C. § 636(b)(1)(B), to conduct all necessary proceedings and render to the presiding District Judge a report setting forth findings, conclusions, and recommendations for the disposition of petitioner's claims.[1]  For the reasons that follow, the undersigned will RECOMMEND that the presiding District Judge enter an Order DENYING petitioner's motion to vacate his sentence and DISMISSING this action from the docket of the court.

## FACTUAL BACKGROUND

On March 29, 2007, petitioner was convicted by a jury for the Western District of Virginia on seven counts of a multiple count Indictment allegedly arising out of his involvement in the distribution of cocaine base ("crack" cocaine). *United States of America v. Adelson*

---

[1] An evidentiary hearing in this case originally was set for April 18, 2011, but it was rescheduled twice. The first continuance was at the request of counsel for the Government, because it was having difficulty finding petitioner's trial counsel Gary Lance Smith. It since has been determined that Smith died sometime after ending his representation of this petitioner. The next date was cancelled because petitioner's first assigned counsel discovered a conflict of interest. (Dkt. Nos. 835, 838, 850.)

1

*Michel and Charceil Kellam*, Criminal No. 5:6CR00041. In Count One, petitioner was charged with being involved in a conspiracy to possess with intent to distribute fifty grams or more of cocaine base beginning no later than January of 2002, and continuing through the return of the Indictment, in violation of 21 U.S.C. § 846. In Count Two, he was charged with distributing 1.81 grams of cocaine base on or about December 10, 2004, in violation of 21 U.S.C. §§ 841(a) and 841 (b)(1)(C). In Count Three, petitioner was charged with distributing 2.8 grams of cocaine base on or about February 25, 2005, in violation of 21 U.S.C. §§ 841(a) and 841 (b)(1)(C). Count Four charged him, as a principal and as an aider and abettor, in the distribution of .75 grams of cocaine base on or about March 22, 2005, in violation of 21 U.S.C. §§ 841(a), 841 (b)(1)(C), and 18 U.S.C. § 2. In Count Five, petitioner was charged with distributing 1.3 grams of cocaine base on or about April 15, 2005, in violation of 21 U.S.C. §§ 841(a) and 841 (b)(1)(C). In Count Six, petitioner was charged with distributing 1.4 grams of cocaine base on or about May 13, 2005, in violation of 21 U.S.C. §§ 841(a) and 841 (b)(1)(C). Finally, in Count Seven, petitioner was charged with distributing 7.7 grams of cocaine base on or about February 25, 2005, in violation of 21 U.S.C. §§ 841(a) and 841 (b)(1)(B).[2]

On September 7, 2007, petitioner was sentenced to 324 months' imprisonment. On June, 3, 2008, the court granted petitioner's motion to reduce his sentence, under the November 1, 2007 Amendments to the United States Sentencing Guidelines, which reduced the base offense levels for crack cocaine offenses. Accordingly, petitioner's term of imprisonment was reduced to 262 months.

---

[2] The Indictment also contained a Count Eight, charging petitioner and Charceil Kellam, as principals and aiders and abettors, with distributing 57.8 grams of cocaine base on or about August 2, 2005, in violation of 21 U.S.C. §§ 841(a), 841 (b)(1)(A), and 18 U.S.C. § 2. On motion of the Government, Count Eight was dismissed against him before trial began. (Dkt. No. 318, 333.)

2

Petitioner unsuccessfully appealed his conviction and sentence to the United States Court of Appeals for the Fourth Circuit, and his petition for a *writ of certiorari* was denied by the Supreme Court of the United States. He then filed this action under 28 U.S.C. §2255 on August 23, 2010. (Dkt. No. 787.) Michel's petition asserts entitlement to relief on the following grounds: (1) his factual innocence with respect to the drug distribution offenses; (2) a fatal variance between the Indictment and the crime proved at trial; (3) the failure of his trial counsel (Gary Lance Smith) to seek a dismissal of the distribution offenses because of the allegedly false testimony supporting them; (4) counsel's failure to inform him of his right to testify on his own behalf; (5) trial counsel's failure to seek a lesser sentence in light of the 100:1 crack powder sentencing disparity; and (6) trial counsel's failure to argue that the drug quantity and leadership role attributed to Michel at sentencing was based on unreliable evidence. On December 21, 2010, the Government moved to dismiss, and petitioner filed a response. (Dkt. Nos. 802, 811.)

In accordance with a Memorandum Opinion entered on February 25, 2011, the presiding District Judge entered an Order granting the Government's motion, in part, and dismissing all claims except the allegation that petitioner's trial counsel, Gary Lance Smith ("Smith"), failed to inform him of his right to testify at trial. (Dkt. No. 815.) The Order then referred that claim to the undersigned to conduct proceedings and to submit a report setting forth appropriate findings, conclusions, and recommended disposition of that claim.

The undersigned appointed, Kathleen M. Todd, Esq., to represent petitioner, and the case was set for an evidentiary hearing. (Dkt. Nos. 817, 835.) Thereafter, a series of events occurred requiring a number of continuances. On April 4, 2011, the Government moved to continue and the undersigned continued the case until July 8, 2011 in order to allow the Government an

3

opportunity to ascertain Smith's whereabouts.[3] Then, Ms. Todd moved to withdraw, and after a hearing on that motion, the undersigned permitted her to withdraw, continuing the hearing, directing the appointment of new counsel for the petitioner and setting a new hearing date. (Dkt. Nos. 848, 849, 850, 853, 865.) On October 12, 2011, an evidentiary hearing was held in which petitioner participated by live video. His counsel was present in the courtroom. Michel and a Haitian Creole interpreter were present by video.

**EVIDENCE PRESENTED**

Without objection, the undersigned took judicial notice of the entire record of the underlying criminal proceeding and appeal, some of which was reintroduced during the evidentiary hearing, and heard testimony presented by both petitioner, Adelson Michel, and Todd J. Freiwald of the Bureau of Alcohol, Tobacco, Firearms and Explosives, the principle investigator in the case. That evidence is summarized below:

**PETITIONER'S CASE-IN-CHIEF**

**ADELSON MICHEL**

Adelson Michel testified that he had long been dissatisfied with Smith as his trial counsel, and that he had sought his replacement both before trial and, then, before sentencing. Michel offered that he virtually had no contact with Smith either before or during trial, having exchanged no emails or telephone calls with him and having met only once while detained in jail pending trial. Michel also stated that Smith did not bring an interpreter to their meeting, despite Michel's poor English.[4] According to Michel, Smith never discussed whether Michel would testify at his trial, whether it would be in his interests to testify, or whether Michel had a right to

---

[3] Smith was terminated as petitioner's trial counsel on June 27, 2007; several months before sentencing took place. He since has died, but the contents of his file were subpoenaed by the Government.

[4] Michel testified that his English has improved greatly since that time.

4

testify. Michel asserted that he learned of this *right* to testify, for the first time, after the trial.[5] Interestingly, Michel revealed that he had informed Smith that he wanted to testify in order to demonstrate his innocence and tell his side of the story. However, Michel explained that he communicated his desire to testify directly to the interpreter at trial, rather than directly to Smith, but that the interpreter did not pass this request along to Smith.

Michel offered that, had he known he had a *right* to testify in his own defense, he would have taken the stand and testified about a variety of matters he believed his attorney failed to address. Michel proffered to the undersigned that his testimony would have concerned the truthfulness of the Government's witnesses, his denial that he knew several of them, and other matters relating to their personal motives for testifying against him.

With respect to the trial testimony of Sarah Johnson, Michel proffered that he would have told the jury he was not in the United States between July 25, 2005 and August 29, 2005, the occasions when Johnson testified Michel was selling drugs. Michel also denied that Johnson knew him or referred to him by various nicknames, such as "Mike," "Cowboy," "A.M," or "all kind of name." He denied that any of those nicknames belonged to him.

Michel also denied that he ever sold crack cocaine to Mannot Lusca, who identified him at trial as a supplier of crack cocaine. Michel would have testified that he did not know Lusca, that his name was not "Mike" as Lusca testified, and that Lusca was "lying."

Michel further stated at the hearing that he would have denied that any drugs were purchased at his home as indicated by the investigative reports of controlled buys. Apparently, petitioner had reviewed those reports prior to trial, and he affirmed again at the hearing that he

---

[5] The term "right" is italicized here in light of petitioner's later admission to the effect that he knew he could testify but did not know he had "right" to do so.

5

was not the individual identified as "Mike" in those reports, and that the drug transactions did not take place at 514 N. Kent Street, Winchester, Virginia, which was his residence.[6]

According to the trial record, Roland Jackson testified at trial that he participated in a video recorded controlled drug buy involving Michel. He identified Michel in the video recorded transaction, which was monitored by Alan Siebert, a Frederick County officer and member of the drug Task Force overseeing the investigation. Michel told the undersigned that, if he had testified, he would have denied being on the video, and that Jackson was "lying," because Michel did not, and still does not, know Jackson and has never had dealings with him. Michel also indicated that Jackson indentified the drug dealer as "Unc," again a name that Michel denied using.

Petitioner addressed the testimony of Robert Scott, who testified at trial that he had purchased crack cocaine from Michel for resale. Michel proffered to the undersigned that, had he testified at trial, he would have said that Scott was "lying."

Petitioner then addressed the trial testimony of Neda Davenport. She had testified at trial that she had witnessed Michel selling drugs, and that petitioner was a customer of her boyfriend Celeste Joseph, who, himself, was involved in the selling of illegal drugs. Michel revealed that, had he testified, he would have explained that Davenport only knew him through other people and that she, too, was "lying." Michel claimed that Davenport agreed to testify in order to

---

[6] Michel repeatedly testified before the undersigned that he went by no nicknames, and that he was not the "Cowboy," "Mike," or "Michael" described either by the eyewitnesses to the drug transactions or the person identified as the supplier in police reports of the undercover transactions. Michel offered that those nicknames referred to different people whom he had never met, and that he was not the person the witnesses identified. On March 23, 2007, the charge of drug distribution set forth in Count Eight of the Indictment was dismissed against petitioner on motion of the Government on the grounds that the person referred to as "Mike" was not Adelson Michel. (Dkt. Nos. 318, 333.)

receive a reduced sentence for her own crimes, stating, "To save yourself, you can say anything to not go to prison."

Michel acknowledged that Laquita Sloane was his former girl friend. She testified at trial that she observed Michel "cooking" cocaine base, and that she both wired money to Haiti and collected money for him. Michel informed the undersigned that, had he testified, he would have told the jury that Sloane's testimony was given in order to help herself and to help her sisters who already were in prison.

The balance of Michel's testimony which he proffered in response to the Government's trial witnesses against him can be summarized as follows:

> a) Tiffany Sloane, who identified Michel as a drug dealer: Michel would have testified that both Sloane and her boyfriend were drug dealers, she was cooperating with the Government to get a lighter sentence, and she was "lying."
> b) Christopher Clark, who testified he bought cocaine from petitioner: Michel would have testified that he met Clark for the first time in lock up, he has had no other dealings with him, Clark was too young a person for petitioner ever to have dealings with him, and Clark was "lying" in order to get a lighter sentence.
> c) Martha Turner, who testified that she had bought drugs from and distributed drugs for petitioner: Michel would have testified that he does not know Turner, and that she was "lying."
> d) Marc Fleurival, who stated he regularly bought crack cocaine from petitioner: Michel would have testified that Fleurival referred to the person he bought from as "Mike," a nickname that petitioner denies ever using, and that Fleurival was

7

cooperating with the Government to get more favorable treatment on charges in separate drug crimes.

In addition to challenging the evidence presented at trial by the Government's witnesses, Michel offered to the undersigned what essentially amounted to alibi defenses. He related that, had he taken the stand, he would have testified that, at all times relevant to the charges set forth in Count Eight of the Indictment, he was not in Virginia.[7] Instead, he asserted that from July 25, 2005 through August 9, 2005, he was in Haiti and offered that the stamps on his passport would so indicate. Michel also testified that he had been in Florida from December 8, 2004 through December 12, 2004, again offering an alibi to the charge that he distributed drugs on the date(s) relevant to Count Two of the Indictment.

Michel offered that the importance of his testimony rests in the fact that it was the only exculpatory evidence in a trial where Smith offered little else by way of defense. Michel noted that his counsel did not call a single defense witness on his behalf. However, he acknowledged that Smith cross examined the Government's witnesses and recalled two of them to the stand in his case in chief. In addition, Michel testified that Smith made no effort to challenge the truthfulness of the Government's witnesses, including exposing their own illegal drug activities. Michel indicated that his testimony would have raised these points which, in his mind, would have been favorable to his case. Michel ended his direct examination by assuring the undersigned that he was telling the truth and not hiding any evidence from the court.

Cross examination first addressed Michel's background. By his account, he was from Haiti and came to the United States in 1992. Michel testified that he had worked as a cab driver in South Florida for eight years before his cab "broke down." Looking to replace the cab, he was

---

[7] See F.N. 6. Because Count Eight was dismissed against Michel prior to trial, his assertion of a right to testify regarding the charges set forth in the count is moot.

8

informed by a friend that cheaper cars could be found in Virginia. He accompanied one Rodney Solomon to Winchester, VA and began buying cars locally in Virginia and then transporting to and selling them in Florida. Michel related that, during this time, he lived with his girlfriend Laquita Sloane in an apartment at 514 N. Kent Street, but he asserted he never got to know other people in town. Michel acknowledged that Laquita only spoke English, not Creole. Accordingly, he communicated with her in English, but had little contact with any other individuals while in Winchester except those at the automobile auctions where, he communicated and conducted business in English.[8] He indicated that, at present, he could speak Haitian Creole, Spanish, and some English.

Michel acknowledged that he previously had been represented by four other attorneys. He became dissatisfied with two of them, and a third had withdrawn due to a conflict.[9] Michel conceded that he would be satisfied with his current assigned counsel, Dana Cormier, Esq., only if he eventually was acquitted. When questioned about Smith, Michel acknowledged that jail visitation records recorded Smith's visits with him, and he conceded that a number of visits were recorded in 2006 and 2007. Michel also admitted that he had spoken to Smith many more times by telephone. Michel did not remember the exact number of calls he had made, but he offered that there had been so many that Smith eventually stopped responding to them. Additionally, Michel testified that, during their meetings, Smith had only advised him to plead guilty and, at trial, did not confer with Michel or pause to seek his advice.

---

[8] Michel testified that he spoke primarily Spanish to his customers while he drove a cab in South Florida.

[9] Michel claimed to have no memory of his first attorney, Edward H. Childress, and insisted that Mr. Smith was the first to actually represent him. Therefore, Mr. Childress is not included in this tally.

9

Counsel for the Government posed several questions related to Michel's interaction with law enforcement personnel while awaiting trial. Michel acknowledged that Smith came to see him with "two law enforcement (officers)," though each time they met with him, Smith only told him to "plea, plea, plea …." Michel was asked whether he had been taken out of his cell by two officers on October 19, 2006 to examine the evidence against him. Additionally, he was asked whether there had been a meeting outside the jail on March 16, 2007 where he, Smith, and Special Agent Todd Freiwald watched a video recording of a controlled drug buy in which Michel was shown to have participated. Michel denied as "a lie" that either event took place. He also continued to deny that he was any of the individuals in the video.

Michel also was questioned concerning his knowledge of his legal rights. Michel testified that he knew he could request documents for his case, but he claimed that many were not introduced at trial. Further, Michel stated, "I knew that I could talk (testify)" at trial but complained that Smith never informed him that he had a *right* to do so. Michel also repeated his earlier testimony that he had told the trial interpreter several times during trial that he wanted to "talk" (testify), but that the interpreter did not pass this request along to Smith. Michel also acknowledged that all of his communications with Smith prior to trial had been in English, though he claimed that Smith never spent much time with him during pre-trial visits. Michel further denied that Smith had stopped to confer with him during trial cross examination, claiming that he only told Smith, "I don't want them (the witnesses) on the stand."[10]

On further cross examination, Michel at first denied, but then admitted, that he had no documentation, such as hotel bills, to show he was not in Winchester during dates relevant to

---

[10] It is clear to the undersigned that Michel labored under a misinformed belief that Smith, somehow, could prevent the Government's witnesses from taking the stand.

10

certain charges. He punctuated the denial simply by contending that the person everyone was talking about was "not me."

Redirect focused mostly on the potential confusion in the record concerning whether petitioner was the person identified as "Mike" or "Cowboy", and on whether he was in the country during the times relevant to Count Eight. Michel continued to assert that he was not in the United States at times encompassed by Count Eight. As mentioned, the charges in Count Eight were dismissed as to petitioner on March 23, 2007, and it is clear from the court's docket that the dismissal occurred prior to the commencement of trial. (Compare Dkt No. 333 with Dkt No. 336.)

## RESPONDENT'S CASE-IN-CHIEF

## TODD J. FREIWALD

Special Agent Todd Freiwald of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") testified that he was the case agent in the investigation of the petitioner's drug-related activities. Freiwald stated that petitioner, Smith, and he had "taken a road trip" at some point prior to trial in order to review the Government's evidence.[11] Freiwald related that at this meeting he showed petitioner a video recording of a controlled drug transaction which, according to Freiwald, featured petitioner. Freiwald also testified that, while he is not a language expert, he observed petitioner's fluency and understanding of English at the time of the meeting, and that it was no different on the date of the proceeding before the undersigned.

On cross, Freiwald testified that an interpreter was not present at his meeting with petitioner and Smith. When asked why the meeting took place, he simply stated that the

---

[11] The undersigned infers from the term that petitioner was taken from pretrial detention and brought to another location where he, Freiwald, and Smith could review the evidence.

Government wanted to give petitioner an opportunity to view the video for himself prior to trial in light of petitioner's denial that he was captured in the video.

## BY JUDICIAL NOTICE

## GARY LANCE SMITH

The undersigned also has taken judicial notice of the closing arguments of Gary Lance Smith at trial. (Dkt. No. 901.) In his summation, Smith pointed out that the Government's witnesses were convicted felons and, either by admission or contradictions in their testimony, were proven "liars." He proffered to the jury arguments about the criminal records of Martha Turner and Sarah Johnson, suggesting the former cooperated to shorten her lengthy prison sentence and the latter to aid her boyfriend. Smith also related that Martha Turner had a long history of drug abuse, and he reminded the jury that Special Agent Freiwald had informed them that drug addicts were unreliable. Accordingly, he advised the jury to not view any of the Government's witnesses as credible.

Smith also sought to discredit the controlled drug buys carried out by law enforcement in this case. He related that Roland Jackson was a career felon who had spent seven years in prison and had returned to selling drugs only some two months after being released. Smith argued to the jury that Jackson made a deal with police to aid himself after he had been arrested. Further, Smith told the jury that police had lost sight of Roland Jackson, their paid informant, in each of the controlled buys in which he participated, thus potentially compromising the operations. Smith hypothesized that Jackson was manipulating these buys to frame Michel. He asserted that when police lost sight of him, it would have been easy for Jackson to pocket the control money and collect a piece of cocaine he had previously stashed in the neighborhood. With access to several family member's homes and friends in the area, Smith pointed out that it would have

12

been easy for Jackson to set something up in order to fool police into thinking he was aiding their investigation. Smith argued Jackson's duplicity by pointing out that the agents later discovered that Jackson was still selling drugs while purportedly working for them.

Smith also sought to undermine the testimony of Laquita and Tiffany Sloane. Smith accused Laquita of lying on the stand to aid her sisters who had been indicted and were facing ten years in prison. Smith also highlighted Tiffany Sloane's frequent relationships with drug dealers. Smith claimed it was perfectly reasonable to think that one of these dealers was the source of the cocaine that Tiffany found, rather than Michel. Smith dismissed the Sloanes' testimony, at best, as being based on assumptions rather than observations and facts.

Smith detailed the criminal records of each other witness as well, discussing those of Robert Scott, Christopher Clark, and Neda Davenport. Smith suggested that their criminal records, when coupled with the pleas they made with the Government, provided motives to testify against Michel. Smith admitted that another witness, Jill Lawson, had no criminal history, but dismissed her testimony as irrelevant and untruthful.

Smith also attempted to explain to the jury the numerous nicknames witnesses claimed were associated with Michel. Smith argued that many Haitians in the area went by the names "Mike" and "Cowboy," possibly four of each, and that the names in no way were unique. Smith also proffered that Count Eight of the Indictment, and much of the testimony of Sarah Johnson, sought to link the nicknames "Cowboy" and "Mike" to Michel, but that the Government was forced to concede his passport proved he was not in the country on August 2, 2005. Smith highlighted that it took the Government fourteen months to recognize this error, and he emphasized that it was Michel who brought the discrepancy to the Government's attention.

13

Smith asked the jury to find that this uncertainty over identification raised a reasonable doubt as to Michel's guilt altogether. While acknowledging that Michel had made poor choices in associates, Smith accused the Government of trying to prove Michel's guilt by association based on his nationality, neighborhood, friends, and unproven nicknames. Smith closed by encouraging the jury to trust to their own judgment and their understanding of the evidence rather than to accept what the Government's witnesses told them merely because the Government claimed they were reliable sources.

## OBSERVATIONS OF WITNESS DEMEANOR AND THE MANNER IN WHICH THE WITNESSES TESTIFIED

While the presiding District Judge will be able to read the transcript of all witness statements during the evidentiary hearing and review the undersigned's summary of the evidence set forth above, the demeanor of the witnesses and their manner of testifying, before the undersigned, especially that of the petitioner, is crucial to determining where the weight of the evidence lies in this case. Frankly, both play a dispositive role in the undersigned's determination of credibility.

To say the least, petitioner's demeanor and conduct while testifying did not instill confidence in the substance of that testimony. His testimony was laced with contradictions. For example, he initially testified that he had met with his trial counsel only once before trial and, otherwise, had not spoken to him. Yet on cross examination, petitioner admitted to having met with Smith at least a dozen times and to having called him so often that counsel's office stopped answering his calls. Petitioner further asserted that he had informed Smith of his desire to testify in order to "show ... [his] innocence." However, he made clear that his requests had been communicated solely to the trial interpreter, rather than his attorney, and that the interpreter did

14

not pass the requests to counsel. He seemed to have ignored the undeniable fact that he sat within earshot of Smith at the counsel table. Moreover, there is no doubt from the trial record that Michel had numerous interactions with counsel during the course of the trial. It is equally clear that he was able to communicate with counsel in English. In other words, the opportunities to communicate any request or demand to testify and to consult with his trial counsel were manifest. To suggest that there was some failure on the part of Smith to respond or interact is rather disingenuous.

Additionally, many of petitioner's assertions during the hearing about what Smith either ineptly presented or altogether failed to present in his defense at trial simply are not supported, and actually are contradicted by the trial record. Petitioner testified that, in general, Smith did not address in the cross examination of the Government's witnesses their criminal records or their incentive to testify, and that he offered little to nothing in the way of exculpatory evidence. He also asserted that counsel did not seek his advice or consult with him during trial. Hence, the reasons why petitioner believes his testimony would have been important had he know he had a *right* to testify.

Yet, a review of the trial transcript reveals quite a different picture, thus demonstrating that these assertions are not accurate. For instance, the cross examinations of both Lusca and Turner demonstrate that Smith questioned them about their experiences as drug dealers and their incentive to cooperate with law enforcement in exchange for potential reductions in their sentences. (Dkt. Nos. 802-1, 802-2.) Further, at least twice during the cross examination of Turner, Smith is shown to have paused to privately confer with petitioner. (Dkt. No. 802-2, 19-20.)

15

Smith's summation discredits petitioner's assertions even further. (Dkt. No. 901). Smith began his closing by calling the prosecution's witnesses criminals and proven "liars" who should not be viewed as credible. *Id.* at 30. Smith highlighted the deals these witnesses had made with the Government, exchanging testimony for less jail time for their own crimes. *Id.* at 31-32, 40-41. Smith also provided specific examples of bias, such as that of Laquita Sloane who was looking to help her sisters and Sarah Johnson's efforts to aid her incarcerated boyfriend. *Id.* at 32, 38. In short, the trial transcript makes clear that many of Michel's claims about how Smith represented him during trial are patently false.

## APPLICABLE PRINCIPLES

### Ineffective Assistance of Counsel

In order to establish that Smith was ineffective, petitioner must show: (1) that counsel's performance was objectively unreasonable when measured against prevailing professional norms, and (2) that the petitioner was prejudiced by the deficient performance in that there is a reasonable probability that the outcome would have been different if not for counsel's deficiency. *See Strickland v. Washington*, 466 U.S. 668, 692-694 (1984); *Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir. 2005). Petitioner must demonstrate both defective representation and prejudice as a result of it before counsel will be found ineffective. He bears the burden of proof under both prongs of the *Strickland* test by a preponderance of the evidence.

### Right to Testify

Generally, a criminal defendant has the right to testify in his own defense. *See Rock v. Arkansas*, 483 U.S. 44, 52, 55-56 (1987); *Daniels v. Lee*, 316 F.3d 477, 490 (4th Cir. 2003). This right is considered a fundamental right that is personal to the defendant. *Sexton v. French*, 163 F.3d 874, 881 (4th Cir. 1998). Further, trial counsel has a duty to inform his client of this

right and is the party most responsible for doing so. *Id.* at 882. Thus, trial counsel's failure to advise his client of the right to testify can constitute objectively unreasonable performance and is, per se, ineffective. *Daniels v. Lee*, 316 F.3d 477, 491 (4th Cir. 2003). However, the right to testify can be waived by a criminal defendant, but to do so, the defendant must know that the right to testify exists, and then he must choose or elect not to testify. *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991).

## FINDINGS AND CONCLUSIONS

The first prong requires proof that his trial counsel's performance fell below that which was objectively reasonable. Failure of Gary Lance Smith to have apprised petitioner of his right to testify, without more, would establish, *per se*, ineffective representation.

The Government in this case has severely tested petitioner's credibility. The cross examination clearly demonstrates that Michel knew he could testify in the case, even though he may not have been apprised of the <u>right</u> to do so by Smith. The rub here for the Government, and the difficulty for the court, is that there is no evidence in the record to refute his testimony that he attempted to invoke the right, even if through the interpreter. While his account is suspect, the absence of evidence contradicting these efforts, and the absence of any affirmative evidence that Smith informed him of his right, or even counseled him concerning this right, leads the undersigned to find that petitioner has established ineffective assistance under the first prong of the *Strickland* test by a preponderance of the evidence.

## PREJUDICE

Even if trial counsel was deficient in his performance, petitioner still must show prejudice by demonstrating a reasonable probability that the trial's outcome would have been different but for counsel's deficiency. The petitioner testified at great length about what he would have said

17

at trial had he been given the chance to testify. However, the trial record demonstrates that he would have presented nothing more, and certainly nothing more effective, than what was presented by Smith's examination of the witnesses and his summation to the jury. It is doubtful that Michel's characterizations of the witnesses as "lying" would have been admissible. FED. R. EVID. 602, 608(a), 701 (2000).[12] Moreover, Smith plumbed the background of the witnesses and their involvement in dealing drugs. Likewise, he challenged their credibility and their personal interests in the outcome of the case by cooperating with law enforcement. Smith further challenged the witnesses' use of nicknames and presented evidence and argument relating to how names such as "Mike" and "Cowboy" were common in the community. Clearly, the passport issue essentially became moot and evidence related to it was rendered irrelevant by the dismissal of Count Eight against Michel. Yet, Smith even made hay with this evidence and the dismissal of Count Eight by asserting the Government's incompetence in taking so long to discover their mistake and in being confused, themselves, over the many nicknames used by individuals in the case. As for petitioner's defense to Count Two, i.e. that he was in Florida for immigration matters on December 10, 2004, the petitioner essentially acknowledged before the undersigned that he lacked any documentation to support this defense.

While the undersigned acknowledges that a criminal defendant's right to testify can be exercised even when, by it, he shoots himself in the foot, so to speak, Michel still must establish prejudice. Here, the undersigned finds and concludes Michel has failed to establish by a

---

[12] *United States v. Schmitz*, 634 F.3d 1247 (11th, 2011) provides a good summary of reasons why a witness testifying on another witness' veracity is objectionable. Among the reasons cited by the court are that such testimony violates several of the Federal Rules of Evidence (401, 602, 608a) and that it is a credibility determination that invades the province of the jury. *Id.* at 1268-1269.

Case 5:06-cr-00041-GEC-RSB    Document 904    Filed 12/05/11    Page 18 of 19    Pageid#: 4874

preponderance of the evidence that there is a reasonable probability that his testimony would have changed the outcome of the trial.[13]

**RECOMMENDATION**

For the forgoing reasons, the undersigned hereby RECOMMENDS that an Order enter DENYING petitioner's motion to vacate his sentence and DISMISSING this action from the docket of the court.

The Clerk is directed to immediately transmit the record in this case to the Honorable Glen E. Conrad. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. The failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations of findings, as well as to the conclusions reached by the undersigned, may be construed by any reviewing court as a waiver of such objection.

The Clerk is directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____
U.S. Magistrate Judge

12/5/11
Date

---

[13] It is the undersigned's view that his proffered testimony would have sealed his conviction.